**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

REX MOLITOR,                               )        NO. CV 05-4537-MAN
                                           )
                    Plaintiff,             )
                                           )        MEMORANDUM OPINION AND ORDER
          v.                               )
                                           )
MICHAEL J. ASTRUE,                         )
Commissioner of the                        )
Social Security Administration,            )
                                           )
                    Defendant.             )
_____)

Plaintiff filed a Complaint on June 22, 2005, seeking review of the denial by the Social Security Commissioner ("Commissioner")[1] of his claim for disability insurance benefits ("DIB").  On November 15, 2005, the parties consented to proceed before the undersigned, pursuant to 28 U.S.C. § 636(c).  The parties filed a Joint Stipulation on July 14, 2006, in which: Plaintiff seeks an order reversing the Commissioner's decision and remanding the case for further proceedings; and Defendant requests that the Commissioner's decision be affirmed.  The Court has

_____

[1]  Michael J. Astrue became the Commissioner of the Social Security Administration on February 12, 2007, and is substituted in place of former Commissioner Joanne B. Barnhart as the Defendant in this action.  (See Fed. R. Civ. P. 25(d)(1); Section 205(g) of the Social Security Act, last sentence, 42 U.S.C. § 405(g).)

1  taken the parties' Joint Stipulation under submission without oral
2  argument.

3

4                  **SUMMARY OF ADMINISTRATIVE PROCEEDINGS**

5

6      Plaintiff filed an application for DIB on January 15, 2002.
7  (Administrative Record ("A.R.") 80-82.)  Plaintiff claims to have been
8  disabled since January 15, 2002, due to degenerative disc disease of the
9  back, degenerative changes of the knees, severe depression, and anxiety.
10  (A.R. 80, 94.)   He has past relevant work experience as an
11  investigator/skip tracer.  (A.R. 151.)

12

13     The Commissioner denied Plaintiff's DIB claim initially and upon
14  reconsideration.  (A.R. 37-41.)  On February 10, 2004, Plaintiff, who
15  was represented by counsel, appeared and testified at a hearing before
16  Administrative Law Judge Dennis Bennett ("ALJ").  (A.R. 786-802.)   On
17  May 27, 2004, the ALJ denied Plaintiff's DIB claim, and the Appeals
18  Council subsequently denied Plaintiff's request for review of the ALJ's
19  decision.  (A.R. 24-35, 7-10.)

20

21                  **SUMMARY OF ADMINISTRATIVE DECISION**

22

23     In his May 27, 2004 written decision, the ALJ found that Plaintiff
24  has not engaged in substantial gainful activity since January 15, 2002.
25  (A.R. 34.)  The ALJ found that Plaintiff has "impairments consisting of
26  degenerative disc disease of the lumbosacral spine . . . [and] minimal
27  degenerative changes of the cervical spine; an adjustment disorder with
28  mild depression; and a history of alcohol and/or drug abuse," the

                                    2

combination of which is "severe." The ALJ further found that Plaintiff's impairments do not meet or equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (*Id.*) In addition, the ALJ found that Plaintiff's testimony regarding his impairments and limitations was not credible. (*Id.*)

The ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform a range of light work, which the ALJ described as follows:

> [Plaintiff] can lift twenty pounds occasionally, ten pounds frequently, stand and/or walk six hours and sit six hours in an eight-hour workday. [Plaintiff] can only occasionally climb, stoop, crouch and crawl, but he can frequently balance and kneel.

(A.R. 34.) Based on this RFC, the ALJ found that Plaintiff could perform his past relevant work as a skip tracer and investigator. (*Id.*) Accordingly, the ALJ concluded that Plaintiff is not disabled within the meaning of the Social Security Act. (*Id.*)

**STANDARD OF REVIEW**

This Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1279 (9th Cir. 1996). The Commissioner's decision must stand if it is supported by substantial evidence and applies the appropriate legal standards. <u>Saelee v. Chater</u>,

94 F.3d 520, 521 (9th Cir. 1996). Substantial evidence is "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995).

Although this Court cannot substitute its discretion for that of the Commissioner, this Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion." Desrosiers v. Sec'y. of Health and Human Serv., 846 F.2d 573, 576 (9th Cir. 1988); *see also* Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995). This Court must uphold the Commissioner's decision if it is supported by substantial evidence and free from legal error, even when the record reasonably supports more than one rational interpretation of the evidence. *Id*. at 1041; *see also* Morgan v. Comm'r. of the Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999); Flaten v. Secretary, 44 F.3d 1453, 1457 (9th Cir. 1995).

**DISCUSSION**

Plaintiff alleges that the ALJ committed three errors. <u>First</u>, Plaintiff contends that the ALJ erred in assessing whether he has a "severe" mental impairment. <u>Second</u>, he contends that the ALJ improperly assessed his physical RFC. <u>Third</u>, he contends that the ALJ improperly considered his testimony regarding his claimed symptoms and limitations. (Joint Stip. at 4.)

4

**A.   The ALJ's Finding At Step Two Regarding Plaintiff's Claimed Mental Impairment Constitutes Error.**

Plaintiff contends that the ALJ erred at Step Two in finding that Plaintiff has no "severe" mental impairment. (Joint Stip. at 4.) Plaintiff asserts that this error is based on the ALJ's failure to consider adequately the opinions of Plaintiff's treating physicians, including Drs. Nicholson, Wythe, Parrish, and Harrison. (Joint Stip. at 9-12.)

The requirement that an impairment be severe is merely "a *de minimis* screening device to dispose of groundless claims." Edlund v. Massanari, 253 F.3d 1152, 1158 (9th Cir. 2001)(*citing* Smolen, 80 F.3d at 1290). "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on [a claimant's] ability to work.'" Smolen, 80 F.3d at 1290 (citing Social Security Ruling 85-28 and Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988)); 20 C.F.R. § 404.1521 ("[a]n impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.") A claim may be denied at step two only if a finding that the relevant impairments are not medically severe is "*clearly established by medical evidence.*" Social Security Ruling 85-28 (emphasis added).

Dr. Nicholson was among the physicians treating Plaintiff at the Veterans Administration Hospital ("VA"). In an August 8, 2003 treatment note, he stated that Plaintiff had a history of depressive symptoms with

irritability, "at times during the course of his illness his depressive [symptoms] have caused him to spend 80% of his time in bed," and those symptoms have been improved by taking Depakote and Wellbutrin. (A.R. 524.)

In a February 25, 2004 Medical Source Statement, Dr. Gerald Wythe found that Plaintiff had "moderate" limitations in his abilities to: understand and remember short, simple instructions; carry out short, simple instructions; understand and remember detailed instructions; carry out detailed instructions; make judgments on simple work-related decisions; interact appropriately with the public; interact appropriately with supervisor(s); and interact appropriately with co-workers. (A.R. 596-97.) Dr. Wythe also found that Plaintiff had "marked" limitations in his abilities to respond appropriately to work pressures in a usual work setting and to changes in a routine work setting. (A.R. 597.)

In a February 26, 2004 Medical Source Statement, Dr. J. Parrish noted that Plaintiff had: 1) "moderate" limitations in his ability to understand and remember detailed instructions; 2) "slight" limitations in his ability to carry out detailed instructions, make simple work-related decisions, interact appropriately with the public, interact appropriately with supervisor(s), interact appropriately with co-workers, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting; and 3) no limitations in his ability to understand and remember short, simple instructions and carry out short, simple instructions. (A.R. 604-05.)

1    In a September 21, 2004 letter, Dr. Diana Harrison, Plaintiff's
2    treating psychologist, explained that: "Individually, each of
3    [Plaintiff's physical, emotional, and social] disabilities would cause
4    a significant impairment in his ability to function but collectively,
5    they have a synergistic negative effect where each tends to interfere
6    with [Plaintiff's] attempts to compensate for limitations that are
7    caused by the others." (A.R. 648.)  She diagnosed Plaintiff with post
8    traumatic stress disorder, oppositional defiant disorder, dysthmic
9    disorder, and alcohol dependence with sustained full remission, and
10   assessed him with a Global Assessment of Functioning ("GAF") of 40.[2]
11   (A.R. 649, 651.)  In describing Plaintiff's ability to function in the
12   workplace, Dr. Harrison stated:

14       [Plaintiff's] physical disabilities limit his potential for
15       employment and jobs that he could handle physically are not
16       available to him because of his social and emotional
17       disabilities.  On the other hand, jobs that he could handle
18       emotionally and socially, such as data entry jobs where there
19       is limited social contact, would not be possible because of
20       his extensive carpal tunnel damage.  Thus, it is my opinion
21       that the overall nature of [Plaintiff's] disabilities render
22       him totally and permanently disabled.

25       [2]    A GAF of 31-40 indicates "[s]ome impairment in reality testing
26   or communication (e.g., speech is at times illogical, obscure, or
     irrelevant) or major impairment in several areas, such as work or
     school, family relations, judgment, thinking, or mood (e.g., depressed
     man avoids friends, neglects family, and is unable to work; child
27   frequently beats up younger children, is defiant at home, and is failing
     at school)."  Diagnostic and Statistical Manual of Mental Disorders Text
28   Revision, 34 (4th ed. 2000) ("DSM-IV-TR").

7

1  (A.R. 651.)

2

3      In explaining the basis for his finding that Plaintiff's claimed

4  mental impairment is not "severe," the ALJ stated:

5

6          I rely on the assessments of the State Agency medical

7      consultants and the consultative psychiatrist to find that

8      [Plaintiff's] mental impairments are not severe.  I find no

9      continuous twelve month period during which [Plaintiff's]

10     mental impairment resulted in more than minimal mental

11     limitations.  This assessment is generally consistent with the

12     assessment of Dr. Parrish, [Plaintiff's] treating

13     psychiatrist, who assessed only slight limitations in most

14     areas of mental functioning with moderate limitations in

15     [Plaintiff's] ability to understand, remember and carry out

16     detailed instructions.

17

18         I do not accept Dr. Nicholson's assessment that

19     [Plaintiff] has experienced "significant disability" from his

20     psychiatric disorder.  Dr. Nicholson appears to base his

21     assessment on [Plaintiff's] subjective complaints.  I note

22     that [Plaintiff] did not seek regular and consistent treatment

23     for his mental condition.  Rather, [Plaintiff] generally

24     sought mental health treatment for only short periods of time.

25     When [Plaintiff] did seek regular mental health treatment, his

26     psychiatrists did not note significant mental limitations.

27     [Plaintiff's] treating physicians did not opine that

28     [Plaintiff's] depressive disorder rose to the level of a major

8

depressive disorder or a bipolar disorder for any consecutive period of twelve months or more.  Thus, the longitudinal treatment record is inconsistent with Dr. Nicholson's assessment.

I do not accept Dr. Wythe's assessment that [Plaintiff] has moderate to marked limitations in mental functioning.  Dr. Wythe is not a mental health specialist and he did not treat [Plaintiff] in that capacity.

Based on the foregoing, I conclude that [Plaintiff] has no severe medically determinable mental impairment that has persisted for twelve consecutive months.

(A.R. 29.)

Here, the ALJ erred in rejecting the opinions of Plaintiff's treating physicians regarding Plaintiff's claimed mental impairment and attendant limitations.  The opinions of treating physicians are given greater weight than those of other physicians.  Smolen, 80 F.3d at 1285.  Treating physicians are employed to cure and therefore have a greater opportunity to know and observe the claimant.  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  Where the treating physician's opinion is contradicted, the ALJ may reject it in favor of a conflicting opinion of an examining physician if the ALJ makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.  Ramirez v. Shalala, 8 F.3d 1449, 1453 (9th Cir. 1993).

9

1     The ALJ's wholesale rejection of Dr. Wythe's opinion regarding

2 mental limitations was improper.   The fact that Dr. Wythe is not a

3 mental health specialist is not a legitimate reason for rejecting his

4 opinion.   *See* Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir.

5 1987)(general practitioner qualified to give opinion on patient's mental

6 health even though practitioner was treating patient for physical

7 problems, and was not a psychiatrist); *but see* 20 CFR §

8 404.1527(d)(5)(more weight generally given to opinion of specialist than

9 generalist).   Although Dr. Wythe treated Plaintiff primarily for

10 physical problems, Dr. Wythe's treatment notes consistently reference

11 Plaintiff's depression and anti-depressant medication.   (A.R. 342 --

12 September 10, 2002 treatment note indicating that Plaintiff was taking

13 Depakote and opining that patient also should be taking anti-

14 depressants; 458 -- August 18, 2003 treatment note indicating that

15 Plaintiff was taking Depakote and Wellbutrin; and 464 -- July 16, 2003

16 treatment note indicating Plaintiff was "angry" and "depressed.")

17

18     Though the ALJ is not required to accept Dr. Nicholson's report[3] of

19 August 8, 2003, the ALJ's rejection of it must stand on substantial

20 evidence.   It does not.   On the contrary, Dr. Nicholson's statement that

21 Plaintiff has a "psychiatric disorder" does have substantial support.

22

23     [3]     While Dr. Nicholson's August 8, 2003 note indicating
"significant disability" was part of an "assessment," the context
suggests this was part of patient's reported history, and not something
24 that Dr. Nicholson clearly endorsed.   (A.R. 524, 29.)   The note reads,
"[Patient] appears to have experienced significant disability from his
25 psychiatric disorder."   (*Id.*)   Dr. Nicholson prefaces the phrase
"significant disability" with "appears to have experienced," indicating
26 that he does not necessarily adopt the presence of "significant
disability" as his own assessment, but rather reserves judgment.
27 However, reference to Plaintiff's "psychiatric disorder" is stated
without qualification, indicating that Dr. Nicholson accepted the
28 presence of some form/degree of mental impairment.

10

(A.R. 524.)  Plaintiff has consistently experienced and exhibited symptoms, such as depression, anxiety, and anger, which he has not been able to control despite counseling, group therapy, and anti-depressant medication.[4]  Plaintiff has also been diagnosed with mental impairments on numerous occasions spanning a more than two year period.[5]  The fact

---

[4]     (A.R. 279-80 -- April 22, 2003 progress record noting that "anxiety episodes occur frequently but do not significantly impair his ability to do things/function" and assessing a GAF of 60; 288 -- April 4, 2003 progress record assessing a GAF of 60 and noting that Plaintiff "has noted some improvement in his depressive symptoms, but no significant change in anxiety symptoms"; 298 -- March 19, 2003 progress record noting Plaintiff's mood was "still not so good" and "insomnia, anhedonia, lethargy, lack of drive/motivation, poor concentration/attention, and poor memory; 301 -- March 6, 2003 medical record assessing a GAF of 60, observing Plaintiff to be "restricted and anxious," and noting insomnia, anhedonia, lethargy, lack of drive/motivation, poor concentration/attention and poor memory; 361 -- progress record indicating depression and anxiety; 489 -- February 4, 2004 progress record indicating that Plaintiff was taking Depakote and Wellbutrin for explosive behavior and depression; 542 -- June 16, 2003 progress record assessing a GAF of 60 and noting that Plaintiff was doing better, but still reporting insomnia, anhedonia, lethargy, lack of drive/motivation, poor concentration/attention, and poor memory; 547 -- May 20, 2003 progress record noting improvement of spending "50% less time in bed, but still reporting "difficulty getting things done" and "difficulty dealing with people in general"; 551 -- May 1, 2003 progress record noting Plaintiff was less depressed and had improved energy, and assessing a GAF of 65; 553 -- April 22, 2003 progress record indicating that Plaintiff "has had only moderate relief of depressive and anxiety symptoms from prior trials of antidepressants, mood stabilizers and bernzodiazepines"; 568 -- March 19, 2003 progress record indicating GAF of 60; 639 -- June 17, 2002 progress record indicating anger and moodiness; 677 -- March 16, 2004 progress record noting that Plaintiff reported feeling unmotivated and lacking in energy; 717 -- May 17, 2004 progress record indicating that Plaintiff acknowledged breaking and throwing things; 756 -- August 3, 2004 progress record indicating that Plaintiff had sought treatment for depression with irritability and reported impulsive driving; and 250 -- September 6, 2000, and June 17, 2002 progress notes indicating Plaintiff was explosive and seeking treatment for depression, sleep disturbance, and anger control.)

[5]     (A.R. 359 -- February 4, 2002 progress record diagnosing anxiety and depression and noting prescriptions for Ativan and Zoloft; 527 -- August 4, 2003 progress record diagnosing depression, not otherwise specified, rule out major depressive disorder and rule out generalized anxiety disorder, and assessing a GAF of 60; 544 -- June 6, 2003 progress record indicating temper problems and diagnosing depressive disorder with anxiety; 638 -- June 28, 2002 progress record

11

that Plaintiff has received varied mental health diagnoses from his treating physicians does not render his mental impairment "non-severe." That Plaintiffs some signs of improvement does not mean that his depression and anxiety, and their effects, have disappeared.  Nor does this negate the possibility that he was disabled, or seriously impaired, for a continuous twelve month period.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00D (stating that an individual's "level of functioning may vary considerably over time[.]  Proper evaluation of [a mental impairment] must take into account any variations in the level of . . . functioning in arriving at a determination of impairment severity over time."); *see also* <u>Lebus v. Harris</u>, 526 F. Supp. 56, 61 (N.D. Cal 1981)(explaining that symptom-free intervals do not compel a finding of nondisability arising from a mental impairment, because "it is extremely difficult to predict the course of mental illness").  Also, Plaintiff's irregular pattern in seeking treatment for his mental impairment, standing alone, may well be a symptom of the underlying impairment.  *See* <u>Nguyen v. Chater</u>, 100 F. 3d 1462, 1465(9th Cir. 1996)("[I]t is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation").

    Unlike Dr. Wythe, Dr. Harrison did not provide an opinion regarding Plaintiff's specific mental limitations in the work-place, but Dr. Harrison did conclude that Plaintiff's limitations rendered him "totally and permanently disabled." (A.R. 651.)  However, Dr. Harrison provided her opinion following the ALJ's decision.

---

diagnosing mood disorder, not otherwise specified, and assessing a GAF of 63, with the highest of 67 for the year; 730 -- June 17, 2004 progress record assessing a GAF of 60 and diagnosing depression, not otherwise specified, rule out major depressive disorder.)

Of course, the ALJ would not have been required to accept Dr. Harrison's opinion that Plaintiff is disabled and cannot work. *See* Smolen, 80 F.3d at 1285; Magallanes, 881 F.2d at 751 (although the treating physician's opinion is entitled to great deference, it is not necessarily conclusive as to the question of disability). Nevertheless, Dr. Harrison's lengthy explanation of the basis of Plaintiff's mental impairment and how the combination of Plaintiff's physical and emotional problems negatively impact his ability to function in the workplace is consistent with and supportive of Dr. Wythe's opinion regarding Plaintiff's mental limitations.

Although Dr. Parrish found that Plaintiff had only "slight" or no limitations in categories where Dr. Wythe found "moderate" or "marked" limitations, Dr. Parrish found that Plaintiff had "moderate" limitations in his ability to understand and remember detailed instructions. Thus, to the extent that the ALJ cited Dr. Parrish's opinion as supportive of his finding that Plaintiff has no "severe" mental impairment, he mischaracterized Dr. Parrish's opinion. *See* Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984)(error for an ALJ to ignore or misstate the competent evidence in the record in order to justify his conclusion).

Finally, it is not clear that the ALJ relied properly on the opinions of Dr. Edward Ritvo, an examining psychiatrist, and the state agency physician, in evaluating Plaintiff's claimed mental impairments. In Dr. Ritvo's June 10, 2003 evaluation, he assessed Plaintiff with a

GAF of 60, which indicates "moderate" symptoms,[6] and noted that Plaintiff "has a long history of antisocial behavior [and] impulsive acting out." (A.R. 425.) Nevertheless, Dr. Ritvo concluded that Plaintiff's symptoms did not warrant a diagnosis of major depressive disorder and that he had no impairment in his ability to function in the workplace. (A.R. 425-26.) However, Dr. Ritvo's evaluation indicates that he had only a small portion of Plaintiff's treatment records. Dr. Ritvo based his report largely upon the history reported to him by Plaintiff, and upon his observations regarding Plaintiff's symptoms and limitations during examination.[7] (A.R. 421-26.) Accordingly, it is unclear whether Dr. Ritvo's assessment is based on a sufficiently complete picture of Plaintiff's condition and took into account all relevant medical evidence of record.[8] Dr. Stone's June 11, 2003 opinion, which notes no

---

[6] A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

[7] In a section entitled "Review of Records," Dr. Ritvo noted that:

> [Plaintiff's] chart contains a record from Kaiser Department of Psychiatry which is not dated but indicates [Plaintiff] was 45 years old at the time. At that point he had had a diagnosis of adjustment disorder, impulse ridden personality with obsessive traits, and Axis V minimal.

(A.R. 421.)

[8] See 20 C.F.R. § 404.1517 ("[i]f we arrange for [a consultative] examination or test, . . . [w]e will also give the examiner any necessary background information about your condition."); Nalley v. Apfel, 100 F. Supp. 2d 947, 953 (S.D. Iowa 2000)("when a claimant is sent to a doctor for a consultative examination, all the available medical records should be reviewed by the examiner"). See also Hurstrom v. Barnhart, 233 F. Supp. 2d 1159, 1166 (S.D. Iowa 2002)("There is no indication that either [consultative physician] had access to any of the medical records which were available at the time of their examinations. . . . Even if Plaintiff told the consulting doctors that he had no limitations, these statements are not credible in light

1   "severe" mental impairment and no functional limitations, also fails to
2   explain its basis and thus does not constitute substantial evidence.
3   (A.R. 427-39.)

4

5       Although Plaintiff contends that the limitations provided by his
6   treating physicians indicate that he could not perform his past relevant
7   work as a skip tracer/investigator (Joint Stip. at 13), the record does
8   not clearly direct that conclusion.  It appears that Plaintiff has a
9   "severe" mental impairment, and the ALJ should reconsider Plaintiff's
10  RFC accordingly.  The ALJ likely will need to elicit testimony from a
11  vocational expert to determine what work, if any, Plaintiff can perform
12  in the national economy with his full array of impairments.  Thus,
13  further development of the record is necessary.  *See, e.g.*, <u>Webb v.</u>
14  <u>Barnhart</u>, 433 F.3d 683, 687 (9th Cir. 2005).

15

16      Accordingly, the ALJ's finding at Step Two that Plaintiff has no
17  "severe" mental impairment is not based on substantial evidence and
18  constitutes error.  Therefore, the court finds that Plaintiff's mental
19  impairment is substantial enough to meet the threshold, *de minimis*
20  standard of "severity."

21  ///

22  ///

23  _____

24  of the numerous laboratory reports showing that his blood sugar is out
    of  control."); <u>Ladue  v.  Chater</u>, 1996  WL  83880,  *5 (N.D.  Cal.
25  1996)(requiring remand where "[t]he ALJ failed to conform to 20 C.F.R.
    § 404.1517 requiring that the consultative examiner be provided with
26  necessary  background  information  regarding  the  claimant's  condition
    [and]  it  appears  from  the  record  that  the  ALJ  gave  Dr.  Mehta's
27  consultative  report  considerable  weight,  even  though  Dr.  Mehta  was
    lacking  important  background  information  regarding  plaintiff.   Thus,
28  Plaintiff  was  prejudiced  by  the  ALJ's  failure  to  develop  the  record  in
    this respect").

**B.** **The ALJ's Finding Regarding Plaintiff's Physical RFC Constitutes Error.**

Plaintiff contends that the ALJ improperly discredited the opinion of Dr. Wythe, Plaintiff's treating physician, in evaluating Plaintiff's RFC. (Joint Stip at 23-25.)

In a February 25, 2004 Medical Source Statement, Dr. Wythe found that Plaintiff: could lift less than ten pounds both frequently and occasionally; could stand and/or walk less than two hours in an eight-hour workday; could sit less than about six hours in an eight-hour workday; is limited from pushing and pulling using his upper and lower extremities; can never climb, balance, kneel, crouch, crawl, and stoop; is limited to fingering frequently and feeling occasionally; is limited in seeing, hearing, and speaking "due to his explosive outbursts"; and is limited from working in environments involving temperature extremes, noise, dust, humidity/wetness, and hazards, such as machinery and heights. (A.R. 599-602.)

In rejecting Dr. Wythe's February 25, 2004 assessment and explaining the basis of his finding regarding Plaintiff's RFC, the ALJ stated:

I rely on the assessment of the State Agency medical consultants to find that [Plaintiff] is limited to a range of light exertional work. Based on my review of the record, the State Agency consultants' assessment is most consistent with the objective medical evidence and generally consistent with

16

1    the assessment of Dr. Kumar, the orthopedic consultant.

2

3         I give less weight to Dr. Wythe's assessment that

4    [Plaintiff] can perform significantly less than the full range

5    of sedentary exertion work.   Dr. Wythe's assessment is

6    inconsistent with the other medical source statements of

7    record and I find it unsupported by the objective medical

8    evidence.

9

10        I do not accept Dr. Wythe's assessment that [Plaintiff]

11   was "disabled" for any period of time.   The issue of

12   disability is reserved to the Commissioner of Social Security.

13

14        Based on the foregoing, I conclude that [Plaintiff]

15   retains the Residual functional capacity to lift twenty pounds

16   occasionally, ten pounds frequently, stand and/or walk six

17   hours and sit six hours in an eight-hour workday.   [Plaintiff]

18   can only occasionally climb, stoop, crouch and crawl, but he

19   can frequently balance and kneel.

20

21   (A.R. 31-32.)

22

23        The ALJ appropriately disregarded Dr. Wythe's conclusion that

24   Plaintiff was disabled.   *See* Smolen, 80 F.3d at 1285; Magallanes, 881

25   F.2d at 751.   However, the ALJ's rejection of Dr. Wythe's February 25,

26   2004 assessment of Plaintiff's physical limitations was flawed.   (A.R.

27   599-603.)   The ALJ gave two reasons for this rejection:   the assessment

28   was not consistent with "other" opinions; and it was not supported by

17

1   objective medical evidence.    (A.R. 32.)    A review of the record,

2   however, shows that Dr. Wythe's assessment is generally consistent with

3   Plaintiff's treatment records and the opinions contained therein.[9]

4   Objective testing substantiates Plaintiff's claimed impairments and

5   symptoms, and the claimed limitations flowing from them.[10]    And, while

6

7       [9]     (A.R. 346 -- July 18, 2002 progress record indicating chronic
neck pain and lower back pain; 353 -- April 15, 2002 progress record
8   indicating nerve block procedure; 356 -- February 11, 2002 progress
record indicating lower back pain radiating to both lower extremities;
9   358 -- February 11, 2002 record indicating nerve block procedure; 362 --
January 18, 2001 progress record indicating chronic lower back pain and
10  recommending that Plaintiff avoid staying in one position for a long
time; 364 -- July 6, 2001 progress record indicating lower back pain;
11  368 -- May 18, 2001 progress record indicating chronic low back pain
with intermittent pain symptoms in the lower extremities, right more
12  than left; 374 -- May 8, 2001 x-ray consultation report indicating an
increase in lower back pain; 376 -- April 20, 2001 physical therapy
13  record noting problem with prolonged sitting; 378 -- March 26, 2001
progress record indicating back pain radiating to legs; 409 -- March 2,
14  2000 clinical assessment indicating intense lumbar pain radiating to
flank or groin; 453 -- October 13, 2003 progress record indicating
15  bilateral hand pain and numbness; 458 -- August 18, 2003 progress record
indicating neck pain; 489 -- February 4, 2004 progress record indicating
16  shooting pains that worsened with lifting and turning head; carpal
tunnel syndrome; and unsteadiness on feet; 502 -- December 10, 2003
17  progress record indicating neck pain; 508 -- November 21, 2003 progress
record indicating myofascial pain syndrome in periscapular region with
18  restricted range of motion; 515 -- October 9, 2003 progress record
indicating multiple musculoskeletal complaints with neck pain; 540 --
19  June 19, 2003 progress record indicating a long history of degenerative
disease in neck and back; 564 -- March 31, 2003 progress record
20  indicating neck and back pain; 580 -- February 5, 2003 progress record
indicating chronic back pain and neck pain; 665 -- February 2, 2004
21  progress record indicating cervical stenosis without radiation and
carpal tunnel syndrome; 667 -- February 4, 2004 medical record
22  indicating neck pain in the right lower neck and trap area, sharp,
stabbing pain; and 682 -- July 1, 2004 progress record indicating
23  multiple musculoskeletal complaints, but mostly with bilateral hands,
due to carpal tunnel syndrome and right ulnar neuropathy.)

24

25      [10]     (A.R. 283 -- March 31, 2003 x-ray of the cervical spine
indicating minimal degenerative changes and bilateral rudimentary
26  cervical ribs; 291 -- March 31, 2003 x-ray of the lumbosacral spine
indicating moderate degenerative changes; 335 -- October 6, 2002 x-ray
27  of the cervical spine indicating minimal broad-based posterior disc
bulge at the C4-C5 level, disc space narrowing, small broad based
28  posterior disc bulge, right greater than left, posterolateral disc
protrusion, and osteophytes at the C5-C6 level; 347 -- July 18, 2002 x-

1    the state agency physicians and Dr. Kumar came to conclusions different

2    from Dr. Wythe in assessing Plaintiff's physical limitations, it is

3    unclear whether these physicians were provided sufficient background to

4    render proper diagnoses/assessments.[11]  (*See* A.R. 443-50 -- June 12, 2003

5    Physical Residual Functional Capacity Assessment completed by a state

6    agency physician whose identity is not clear indicating that Plaintiff

7    is limited to "light" work with other postural and non-postural

8    limitations; 416-20 -- Dr. Kumar's June 7, 2003 orthopedic evaluation

9    indicating that he reviewed only a November 1987 discharge from Verdugo

10   Hills Hospital following Plaintiff's surgery for a bilateral L5-S1

11   laminectomy, foraminotomy, and diskectomy.)   They do not, therefore,

12   constitute substantial evidence and fail to support the ALJ's physical

13   residual capacity finding.   Accordingly, the ALJ's physical RFC finding

14   _____

15   ray of the cervical spine indicating mild spondylosis deformans,
     narrowing of the C5-C6 intervertebral disc space, and mild scoliosis in
16   the cervical and thoracic spine; 365 -- June 25, 2001 x-ray indicating
     degenerative changes, mild relative narrowing of the canal at L4-L5, and
17   neural foraminal narrowing; and degenerative change at the end plates,
     disc space narrowing, disc desication, broad-based posterior disc bulge
18   of the thecal sac, bilateral posterolateral disc protrusions and
     osteophtes which narrow the neural foramina, and mild face hypertrophy
19   at the L5-S1 level; 455 -- October 7, 2003 nerve conduction/EMG report
     indicating carpal tunnel syndrome; 466 -- February 25, 2004 nerve
20   conduction study indicating thoracic outlet syndrome on the right, mild
     ulnar compression neuropathy at the elbow, very mild bilateral carpal
21   tunnel syndrome; 470 -- May 19, 2003 abnormal EMG of the right upper and
     lower extremities showing chronic changes in the right L5 myotome
22   consistent with right L5 chronic radiculopathy without current active
     deneravation; 472 -- March 31, 2003 x-ray of the lumbosacral spine
23   indicating moderate degenerative changes; 488 -- September 15, 2003
     abnormal EMG indicating thoracic outlet syndrome on the right and mild
24   ulnar compression neuropathy at the elbow on the right, and very mild
     bilateral carpal tunnel syndrome; 538 -- June 19, 2003 abnormal EMG of
25   the right and lower extremities showing chronic changes in the right L5
     myotome consistent with right L5 chronic radiculopathy without current
26   active denervation; and 652 -- May 27, 2004 x-ray of bilateral wrists
     showing minor abnormality.)

27

28         [11]   *See* 20 C.F.R. § 404.1517; <u>Nalley</u>, 100 F. Supp. 2d at 953;
     <u>Hurstrom</u>, 233 F. Supp. 2d at 1166; <u>Ladue</u>, 1996 WL 83880 at *5.

1  constitutes error.

2

3  **C.    The ALJ Erred In Rejecting Plaintiff's Credibility Regarding His**

4        **Claimed Limitations And Symptoms**.

5

6       Plaintiff argues that the ALJ's rejection of Plaintiff's

7  credibility constitutes error.  (Joint Stip. at 31-35, 39-41.)

8  Plaintiff further contends that the reasons given by the ALJ for

9  rejecting Plaintiff's claimed limitations and symptoms are not supported

10 by the record.  (Joint Stip. at 32-34.)  In addition, Plaintiff contends

11 that the ALJ improperly failed to address the statements provided by

12 Marilyn Molitor, Plaintiff's wife.  (Joint Stip. at 35.)

13

14      Generally, the Court gives great weight to the ALJ's credibility

15 assessment. Anderson v. Sullivan, 914 F.2d 1121, 1124 (9th Cir. 1990);

16 Brawner v. Secretary, 839 F.2d 432, 433 (9th Cir. 1988)(recognizing that

17 the ALJ's credibility determination is to be given great weight when

18 supported by substantial evidence).  In rendering a credibility

19 evaluation, the ALJ may consider:  "(1) ordinary techniques of

20 credibility evaluation, such as the claimant's reputation for lying,

21 prior inconsistent statements concerning the symptoms, and other

22 testimony by the claimant that appears less than candid; (2) unexplained

23 or inadequately explained failure to seek treatment or to follow a

24 prescribed course of treatment; and (3) the claimant's daily

25 activities."  Smolen, 80 F.3d at 1284.  When an ALJ's decision rests on

26 a negative credibility evaluation, "the ALJ must make findings on the

27 record and must support those findings by pointing to substantial

28 evidence on the record."  Cequerra v. Secretary, 933 F.2d 735, 738 (9th

1  Cir. 1991).  These findings must be "sufficiently specific to permit the
2  reviewing court to conclude that the ALJ did not arbitrarily discredit
3  the claimant's testimony."  Orteza v. Shalala, 50 F.3d 748, 750 (9th
4  Cir. 1995).

5

6      In rejecting the credibility of Plaintiff's claimed limitations and
7  symptoms, the ALJ stated:

8

9          [Plaintiff's] credibility is reduced by the failure of
10         the objective medical evidence to substantiate disability.
11         While [Plaintiff's] impairments do not more than minimally
12         affect his ability to perform basic work activities, the
13         objective medical evidence substantiates that he remains able
14         to perform a range of light work.

15

16         [Plaintiff's] credibility is reduced by his failure to
17         follow prescribed treatment.  Treatment notes from the
18         Veteran's Administration-Sepulveda medical center and Kaiser
19         Permanente show that [Plaintiff] failed to show for a number
20         of medical appointments (Exhibit 6F, pp. 35, 50; Exhibit 5F,
21         pp. 21, 26,34).  Although [Plaintiff's] physical therapist
22         noted improvement with treatment, [Plaintiff] requested that
23         he be discharged from physical therapy (Exhibit 13F, p. 34).
24         In February 2004, a Veteran's Administration physician noted
25         that [Plaintiff] was "unwilling to follow through with the
26         physical therapy program prescribed for him (Exhibit 13F, p.
27         22).

28

In February 2004, a Veteran's Administration-Sepulveda physician noted that [Plaintiff] was putting forth a "poor effort" (Exhibit 13F, p. 51).

[Plaintiff] appears to exaggerate his symptoms and this reduces his credibility. On June 7, 2003, during the orthopedic consultative evaluation, the examiner noted that [Plaintiff] walked with a normal gait and did not require any assistive device for ambulation (Exhibit 8F). Several days later, however, during the psychiatric consultative evaluation, [Plaintiff] presented as walking with a limp and he used a cane (Exhibit 9F, p.3). In February 2004, a Veteran's Administration physician noted that [Plaintiff's] reported symptoms were inconsistent with results of objective testing (Exhibit 13F, p.23).

In September 2003, a Veteran's Administration-Sepulveda psychiatrist questioned why [Plaintiff] was seeking psychiatric treatment at the Veteran's Administration facility and at Kaiser Permanente (Exhibit 13F, p. 55). While [Plaintiff] reported that he no longer wished to seek treatment at the Veteran's Administration-Sepulveda facility and continue treatment at Kaiser Permanente, he returned to the Veteran's Administration on February 12, 2004 stating that he no longer had insurance coverage at Kaiser Permanente (Exhibit 13F, p. 18). A medication log from Kaiser Permanente, however, shows that [Plaintiff] continued to receive prescriptions from his Kaiser Permanente physicians at

least though February 24, 2004 (Exhibit 17F, p. 1).  It
appears that [Plaintiff] was simultaneously seeking treatment
at both facilities and obtaining drug prescriptions from both
facilities as well (See Exhibit 13F; Exhibit 17F, p. 1, 13,
18).

(A.R. 32-33.)

Plaintiff testified that his neck pain causes difficulty in turning
his neck and radiates down his shoulders, especially in his right arm.
(A.R. 791.)  In addition, he testified that he has pain in his elbow and
carpal tunnel syndrome in both hands, which causes difficulty with
writing.  (*Id*.)  He further testified that his lower back pain radiates
to his legs and his right foot which, in combination with his dizziness,
causes him to stumble and fall a couple of times per week.  (A.R. 792.)
His back pain is aggravated by sitting and lifting.  (A.R. 793.)  He
also testified that he:  has depression and anxiety; "lash[es] out at
people" and "want[s] to be by [himself]"; and has engaged in
inappropriate behavior towards others, including physical abuse of his
spouse.  (A.R. 794.)  When he is depressed, he "[doesn't] want to do
anything" and "sometimes [lays] in bed for days," which he says occurs
"probably three days a week."  (*Id*.)

The record contains objective evidence supporting Plaintiff's
claimed neck, hand, and back pain.[12]  The ALJ's assertion that there is
no objective evidence on the record to support Plaintiff's claimed

---

[12]    *See* Note 7, *supra*, and accompanying text.

23

symptoms and limitations is, therefore, incorrect. (A.R. 32.) Morever, it is error to require a claimant to adduce evidence supporting the extent of his claimed symptoms and limitations. *See* <u>Tonapetyan</u>, 242 F.3d at 1147-48; <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 345 (9th Cir. 1991); <u>Fair v. Bowen</u>, 885 F.2d 597, 602 (9th Cir. 1989).

In his credibility rejection, the ALJ also stated that Plaintiff failed to follow his prescribed treatment because:  he did not attend a number of appointments for treatment; did not follow through with physical therapy; and was observed to put forth a "poor effort" in one instance.  However, Plaintiff's point is well-taken that he discontinued physical therapy because he did not feel he was obtaining sufficient benefit from it, a point which is reflected in the treatment records. (A.R. 499 -- December 17, 2003 progress note indicating Plaintiff did not wish to continue at this time, because he did not feel as though treatment is working, stating that he "feels good for a couple days afterwards is all.")  In addition, physical therapy notes indicate that Plaintiff's therapy was not sufficiently useful or beneficial.  (A.R. 497 -- December 24, 2003 hand occupational therapy notes discharging Plaintiff and indicating that Plaintiff "has made no significant progress and still presents with problems listed at date of initial evaluation" and "has received maximum benefit from occupational therapy and presents with no significant functional problems.")  The record cited by the ALJ as noting a "poor effort" does not show that Plaintiff was failing to follow prescribed treatment; rather, this is a progress record which vaguely mentions that Plaintiff's performance on Spurling's and Adson's testing was "limited due to pain and poor effort."  (A.R. 516.)

24

1    The ALJ further noted that Plaintiff was exaggerating his symptoms
2  based on his limping and use of a cane, because several days prior to
3  reporting such symptoms he was observed to have a normal gait at an
4  orthopedic consultative evaluation.  However, Plaintiff has alleged that
5  he uses a cane, not only due to pain, but also due to dizziness and
6  unsteadiness on his feet.   Moreover, Plaintiff's treatment records
7  support his complaints of dizziness and need for the use of a cane.[13]
8  Thus, the reasons provided by the ALJ were not sufficient to reject
9  Plaintiff's claimed ambulation problems.

11   The ALJ also discredited Plaintiff's claimed limitations and
12 symptoms because Plaintiff stated, on February 12, 2004, that he no
13 longer had insurance coverage at Kaiser Permanente, but then received a
14 prescription from Kaiser on February 24, 2004.  Without more, the value
15 of this potential inconsistency between Plaintiff's statement and
16 subsequent action is questionable.   Plaintiff did not state a coverage
17 termination date; and he could have meant that his Kaiser coverage
18 terminated at month's end or he could have refilled an earlier Kaiser
19 prescription on February 24, 2004.

---

[13]    (A.R. 489 -- February 4, 2004 progress record indicating that Plaintiff walked with a cane, "because he is unsteady on his feet"; "he falls down a lot"; and his "last fall was 10 days ago getting out of bed"; 502 -- December 10, 2003 progress record indicating that "[Plaintiff's] balance is severely impaired due to his [psychiatric medication and] he reports that he can't turn [his] head quickly without getting dizzy and losing his balance"; 535 -- July 17, 2003 progress record indicating that Plaintiff reported dizziness, which he described as "spaciness" and feeling "not alert" and "light-headed"; 581 -- February 5, 2003 progress record noting dizziness; and 650 -- Dr. Harrison's September 21, 2004 letter indicating that Plaintiff "was issued a cane to help with a severe balance problem" and he "has chronic pain that runs from the back down his legs and his foot drags, causing him to stumble.")

Finally, Plaintiff correctly contends that his claimed symptoms and limitations are further supported by the May 20, 2003 written statement completed by his wife.  In her statement, she noted that Plaintiff: has trouble bending and reaching, such that she cuts Plaintiff's toenails because he cannot bend to do it; uses a cane to prevent himself from falling; and is cranky and impatient, "blows up and curses a lot," and "gets into conflicts with clerks, etc." (A.R. 119-24.)  As her comments are relatively brief, and the case is being remanded, the ALJ should specifically address the contentions she makes regarding Plaintiff's symptoms and limitations.

Accordingly, the ALJ's rejection of Plaintiff's claimed limitations and symptoms constitutes error.

**D.   Remand Is Required.**

Here, remand is appropriate to allow the ALJ the opportunity to correct the above errors with respect to Plaintiff's mental and physical RFC and the credibility of his claimed limitations and symptoms.  *See* Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004)(where ALJ erred by discounting treating physicians' opinions, remand for further proceedings is appropriate if enhancement of the record would be useful); McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989)(remand appropriate to remedy defects in administrative proceedings).

///

///

///

**CONCLUSION**

Accordingly, for the reasons stated above, the denial of benefits is REVERSED, and this case is REMANDED for further proceedings consistent with this Memorandum Opinion and Order. Judgment shall be entered reversing the decision of the Commissioner, and remanding the matter for further administrative action consistent with this Memorandum Opinion and Order.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for Plaintiff and for Defendant.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: January 31, 2008

                                          /s/
                                   MARGARET A. NAGLE
                           UNITED STATES MAGISTRATE JUDGE

27